# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| STEWART SHUNK, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 3:21-cv-00562 |
| TRANE TECHNOLOGIES COMPANY, LLC, | ) ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION

When Stewart Shunk was fired by Trane Technology Company, LLC ("Trane" or the "Company"), he lost the chance to earn commissions on deals that he had dedicated substantial time and energy to securing for his employer. But rather than challenge his status as an at-will employee or the terms of Trane's compensation plan, Shunk asked the Court to ignore them in favor of certain novel at-will tort and quasi-contractual claims. (Doc. No. 38-2 at 1, 22). Unfortunately for Shunk, neither his employment status nor the Company's compensation plan can be so easily overlooked. For the following reasons, the Court will grant Trane's Motion for Summary Judgement (Doc. No. 31).

## I. FACTUAL ALLEGATIONS AND BACKGROUND[1]

In March 2015, Trane hired Shunk as an Account Manager. (Doc. No. 38 at ¶ 1). From that point forward and until Trane fired him on July 23, 2020, Shunk was an at-will employee. (Id.

---

[1] The facts in this section are undisputed unless specifically noted otherwise and are drawn from the undisputed portions of the parties' statements of facts (Doc. Nos. 38, 41), the exhibits, depositions, and declarations submitted in connection with the summary judgment briefing, and portions of the Verified Complaint (Doc. No. 1) that are not contradicted by the evidence in the record.

at ¶¶ 2, 7). Shunk's compensation plan was straight forward; he received a base salary and a commission as defined by the Company's compensation plan. (Id. at ¶ 3). When Shunk was fired, he was subject to Trane's written North America Sales and Incentive Compensation Policy (the "Compensation Policy" or the "Policy"), which has two relevant provisions. (Id. at ¶ 4). First, it provides that Trane need only pay an employee a commission that the employee has "earned" on or before the date of the employee's termination. (Id. at ¶ 11). Second, it provides that an employee has only "earned" a commission when the transaction closes. (Id. at ¶ 12; see also id. at 11 ("Crediting for the purposes of calculating commissions occurs when the transaction closes, i.e., when the transaction revenue is recognized by the Company for external financial purposes.")). Thus, if an Account Manager subject to the Policy quit or was fired while a transaction was pending, he or she would not be entitled to a commission for that pending transaction. That Account Manager would, however, still receive their salary for the time spent working on that transaction.

On May 18, 2020, Jim Crone, a Trane employee who worked in a customer-facing sales role "in tandem" with Shunk, informed Shunk that the Company had fired Crone and that his last day would be June 1, 2020. (Doc. No. 1 at ¶¶ 16–17, 29). At the time, Shunk was on a conference call with the rest of the sales team, which included Alvaro Hernandez, Regional Sales Manager, and Owen Nevader, Comprehensive Solutions Leader. (Id. at ¶¶ 29–32). This was an apparent surprise to the team on the call except for Hernandez, who had been notified of the decision three days earlier and was instructed to effectuate it. (Id. at ¶¶ 31–34). However, Hernandez did not fully understand Crone's central role on the sales teams. (Id. at ¶ 36). After the team conference call, Shunk explained that he and Crone did not share their duties equally; Crone primarily served as the front man who built and maintained client relationships, while Shunk worked behind the

scenes on the details of the individual proposals. (Id. at ¶¶ 33, 35–36). Shunk told Hernandez that Crone's absence would impair Trane's chances of securing work from current and potential clients, (id. at ¶ 37), and the two projects most acutely affected would be (1) the Shelby County Schools project; and (2) the Memphis River Parks Partnership project. (Id. at ¶ 42). Both had submission deadlines in June 2020. (Doc. No. 38-7 at 3). Over the next few days, Shunk, Crone, Hernandez, Nevader, and Eric Bauer, the National Manager of Comprehensive Solutions, (collectively, the "Group") had multiple conversations about how to preserve the relationships that Crone had formed with important potential accounts. These conversations centered on how to keep Crone involved following his termination and how to explain his continued involvement to Trane employees if any questions arose. (Doc. No. 1 at ¶¶ 44, 46).

On June 1, 2020, Crone's termination became effective—he was no longer a Trane employee. (Doc. No. 38-7 at 2). At this point, Crone's Trane email account was deactivated, but Shunk and other members of the Group continued to communicate with him to keep him informed and involved in the projects. (Doc. No. 1 at ¶¶ 47–49).

On June 4, 2020, during a call between Hernandez, Shunk, and Crone, Hernandez explicitly instructed Shunk to "lean on [Crone]" and for the Crone to "continue to work for Trane as if nothing had happened in order to keep [Crone's] customer relationships fresh and tied to Trane." (Doc. No. 41 at ¶ 18; Doc. No. 38-7 at 3). At the time, they agreed that they would be able to bring Crone back to Trane in due time, and that, without Crone in the interim, the Group had "no shot at [Shelby County Schools or the Memphis River Park Partnership's] business." (Doc. No. 41 at ¶ 18). According to Shunk, Hernandez's instruction implied a promise that if Shunk worked with

3

Crone, he would not be fired for doing so.[2] (Doc. No. 38 at ¶¶ 16–18). Initially, Shunk had ethical concerns regarding Crone's continued involvement in Trane projects, but those concerns were alleviated after discussing them with his Group. (Doc. No. 41 at ¶ 20). In other words, rather than seek advice outside the Group, Shunk consulted the very circle he had conspired with to keep Crone involved in Trane projects.

Others, including Trane employees and potential clients, were seemingly aware of Crone's continued involvement in the Shelby County Schools and Memphis River Parks Partnership projects. In his deposition, Owen Nevader described Hernandez's authorization of Crone's involvement as "[not] a secret." (Doc. No. 41 at ¶ 26). More concretely, Crone personally delivered the final Request for Qualification for the Shelby County Schools project on Trane's behalf, (id. at ¶ 15), and that Request for Qualification identified Crone as the primary contract at Trane. (Doc. No. 41 at ¶ 10). By that point, nearly three weeks had passed since Trane had fired Crone. (Doc. No. 38-7 at 3). Two weeks after Crone was fired, he personally delivered the Memphis River Partnership project's Request for Qualification, which included his name, photograph, and resume. (Id.; Doc. No. 41 at ¶ 10).

After the submissions of these Requests for Qualification, Janet Bell, a Trane Senior Human Resources Partner, began investigating Crone's involvement in Trane projects following his termination. According to Bell, the investigation was prompted by a demand letter she received from Crone's attorney on July 17, 2020, related to a potential claim of age discrimination. (Doc. No. 41 at ¶ 2; Doc. No. 1 at ¶ 76). Six days later, and without interviewing him, Trane terminated Shunk's employment, citing violations Trane's Code of Conduct, which it asserts prohibits passing

---

[2] The record contains no evidence of an explicit promise by Hernandez or any other Company employee that Shunk would remain employed if he continued to involve Crone in Trane projects.

4

confidential information to a non-Company employee, sharing information with a competitor, and misrepresenting to a customer that Crone was still a Trane employee. (Doc. No. 41 at ¶¶ 3–5). When he was fired, Shunk told Bell that he had been authorized to work with Crone by Hernandez, but this information did not change Trane's decision. (Doc. No. 41 at ¶ 16).

Trane did not win the either the Shelby County Schools or the Memphis River Park Partnership contract. (Doc. No. 48 at ¶ 20). As a result, had Shunk stayed on, he would not have earned commissions on either project. Despite this, Shunk has brought suit arguing that he is entitled to these and other commissions for transactions pending when he was fired, among other things, on the grounds that Hernandez's alleged instruction to work with Crone constituted a promise that if he did so, he would not be fired. (See generally Doc. No. 1).

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. Id.

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the

matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

Moreover, if, "after adequate time for discovery and upon motion," the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial[,]" a court should enter summary judgment in favor of the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When this occurs, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 323 (citation an internal quotation marks omitted). Conclusory statements "unadorned with supporting facts are insufficient." Viet v. Le, 951 F.3d 818, 823 (6th Cir. 2020). Thus, if the nonmovant does not support the elements of a claim or defense, the moving party is entitled to judgment as a matter of law.

### III.  ANALYSIS

Before addressing whether a genuine dispute of material fact exists, two material undisputed facts bear repeating: (1) Shunk was an at-will employee, and (2) he was subject to the Compensation Policy. (Doc. No. 38-2 at 1, 22). Shunk's concession of these facts is significant. Shunk has neither challenged the enforceability of the Policy, nor alleged any breach of contract. (Doc. No. 38-2 at 22). Moreover, Shunk has emphatically renounced any claim for wrongful termination. (See Doc. No. 38-2 at 1 (stating "this is not a claim for wrongful termination" in bold, capital letters)). Instead, Shunk theorizes that by, discarding his potential contractual and wrongful termination claims, he can sidestep the legal import of the terms of his employment and salvage a

handful of tort and quasi-contractual causes of action arising from his at-will employment. This is not so.

1. <u>The Terms of Shunk's Employment Bar Recovery</u>

Tennessee has long adhered to the employment-at-will doctrine in employment relationships not established or formalized by a contract for a definite term. <u>Crews v. Buckman Labs. Int'l, Inc.</u>, 78 S.W.3d 852, 857 (Tenn. 2002). Under this doctrine, both the employer and the employee are generally permitted to terminate the employment relationship "at any time for good cause, bad cause, or no cause at all, without being guilty of a legal wrong." <u>Stein v. Davidson Hotel Co.</u>, 945 S.W.2d 714, 716 (Tenn. 1997); <u>see also</u> <u>Hill v. Sw. Tenn. Cmty. Coll.</u>, No. W2010-01222-COA-R3-CV, 2010 WL 4962895, at * 2 (Tenn. Ct. App. Dec. 7, 2010). As a result, "[e]mployees-at-will have no contract right or expectation of continued, indefinite employment. <u>Goot v. Metro. Gov't of Nashville & Davidson Ctny.</u>, No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *8 (citing <u>Crews</u>, 78 S.W.3d at 858) (Tenn. Ct. App. Nov. 9, 2005).

Granted, as the parties agree, an employer's discretion to terminate an at-will employee is not absolute. (Doc. Nos. 38-2 at 11; 40 at 5). For instance, "an employee-at-will generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." <u>Stein v. Davidson Hotel Co.</u>, 945 S.W.2d 714, 716–17 (Tenn. 1997). But these exceptions are few, and bad faith alone is not among them. <u>See</u> <u>McGee v. Best</u>, 106 S.W.3d 48, 67 (Tenn. Ct. App. 2002) ("There is no implied covenant of good faith and fair dealing in an employee-at-will contract.").

Trane argues Shunk's case seeking damages for his services to Trane cannot survive summary judgment because recovery is precluded by Tennessee's doctrine of at-will employment

7

and the express terms of the written compensation policy. (Doc. No. 32 at 5). The Company further argues Shunk failed to establish with admissible evidence that any Trane employee with authority in fact made a promised to Shunk that would override his at-will employment and the express terms of the Policy. (Id.)

In response, Shunk contends that his at-will employment status cannot "provide blanket immunity for employer misconduct." (Doc. No. 38-2 at 11). While this in undoubtedly true in the abstract, Shunk makes no attempt to connect this broad principle to the facts at hand, especially his prayer for compensation for his services to Trane. Indeed, while he cited Stein for the proposition that "certain restrictions have been imposed upon the right of an employer[] to terminate an at-will employee," (id. at 11 (citing Stein, 945 S.W.2d at 716)), Shunk did not mention a single restriction on at-will employers that might apply here. (See generally, Doc. No. 38-2 at 11–12). Nor could he. There is no statutory or constitutional right, or public policy evidenced by unambiguous constitutional, statutory, or regulatory provisions that could overcomes the doctrine of at-will employment in this instance.

Moreover, Shunk fails to establish that his at-will employment was modified by Hernandez's alleged direction to work with Crone. Granting every available reasonable inference in favor of Shunk, one could conclude that others at Trane were aware that Crone was working with Shunk at Hernandez's direction and that the Company had no issue with him doing so until the Requests for Qualification were submitted. However, the record lacks any evidence showing that Hernandez sought to modify the terms of Shunk's employment when he told him to work with Crone or that Hernandez had the authority to do so. Because Shunk was an at-will employee, Trane could terminate his employment "at any time for good cause, bad cause, or no cause at all." Stein, 945 S.W.2d at 716. This means it could fire him for doing his job. Without more, Shunk's

8

claims fail as a matter of law. Any compensation Shunk remains entitled to is dictated by the Policy. This Court need not delve deeper.

2. Shunk's Misrepresentation and Promissory Estoppel Claims Fail on Their Face.

Were one to accept Shunk's creative theory that his at-will employment status does not preclude his misrepresentation and promissory estoppel claims—which the Court does not—those claims still would not survive summary judgment because Shunk has failed to provide evidence sufficient to allow a trier of fact to find two essential elements of these claims.

Both intentional and negligent misrepresentation, as well as promissory estoppel, require that Shunk establish, among other things, that (1) Hernandez told Shunk that he would not be fired for continuing to work with Crone after Crone was fired; and (2) Shunk either reasonably or justifiably relied on that statement. See Waler v. Sunrise Pontiac–GMC Truck, Inc., 249 S.W.3d 301, 311 (Tenn. 2008) ("To prove a claim based on fraudulent or intentional misrepresentation, a plaintiff must show that: (1) that the defendant made a representation of a present or past fact . . . (5) plaintiff reasonably relied on the misrepresented material fact"); Robinson v. Omer, 952 S.W.2d 423, 427 (Tenn. 1997) (explaining that two essential elements of negligent misrepresentation are that: (1) "the defendant supplies faulty information meant to guide others in their business transactions"; and (2) "the plaintiff justifiably relies upon the information"); Chavez v. Broadway Elec. Serv. Corp., 245 S.W. 398, 404 (Tenn. Ct. App. 2007) ("To succeed on their promissory estoppel claim, the Plaintiffs were required to show (1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that they reasonably relied on the promise to their detriment.").

Based on the record evidence, Shunk can establish neither. Seemingly aware of this, Shunk attempts to buttress his case with conclusory statements disguised as material facts, but these are

9

precisely the kinds of unsupported claims that ring hollow at summary judgment. Viet, 951 F.3d at 823.

First, Shunk fails to show there is evidence sufficient for a trier of fact to find that Hernandez promised Shunk that he would not be fired for working with Crone after June 1, 2020. At best, the evidence shows that, on June 4, 2020, Hernandez told the Shunk to "lean on [Crone]" as much as he needed. (Doc. No. 38-7 at 3). But this instruction, which was an essential part of the Group's larger conspiracy which they sought to hide from at least some at the Company, is far from a guarantee that Shunk would remain employed if he worked with Crone. In his deposition, Shunk was asked and failed to identify a specific person who told him that he would remain employed if he kept Crone involved after his termination; instead, Shunk recited his Group's rationale for continuing their work with Crone. (Doc. No. 41 at ¶ 18). Without evidence of such a promise or representation, Shunk cannot establish an essential element of his misrepresentation and promissory estoppel claims and they must fail.

Second, Shunk's misrepresentation and promissory estoppel claims fail because a trier of fact could not find that Shunk reasonably relied on Hernandez's instruction to lean on Crone as a guarantee of continued employment. Despite Hernandez being Shunk's supervisor, there is no evidence demonstrating that Hernandez had the authority to ensure Shunk would not be fired. If anything, the evidence supports the opposite conclusion; after all, Shunk and Crone worked "in tandem" and Hernandez was merely informed of the decision to fire Crone—he played no role in making the decision. Indeed, the entire Group, which included Hernandez and others who Shunk

asserts were also his supervisors, was unable to stop or stall Crone's initial termination or rehire him prior to the submission of the Requests for Qualification.

Regardless, Shunk cannot point to evidence sufficient to demonstrate that his reliance was reasonable. Instead, he claims, without any supporting evidentiary citation, that "Shunk reasonably relied on this dictation [to lean on Crone as needed] by Mr. Hernandez that if he followed this plan, he would not be fired." (Doc. No. 41 at ¶¶ 16–17). This conclusory statement is precisely the kind of assertion that cannot be credited at summary judgment.[3]

3. <u>Shunk's Equitable Claims Also Fail in the Face of the Compensation Policy</u>

Quasi-contractual equitable remedies are unavailable in instances where a valid contract cover the relevant subject matter. See <u>Doe v. HCA Health Servs. of Tenn., Inc</u>., 46 S.W.3d 191, 197 (Tenn. 2001) ("A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown: (1) there is no existing, enforceable contract between the parties covering the same subject matter"); see also <u>Whitehaven v. Cmty. Baptist Church v. Holloway</u>, 973 S.W.2d 592, 596 (Tenn. 1998) ("Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist"); see also <u>Doe v. Belmont Univ.</u>, 334 F. Supp. 3d 877, 901–02 (M.D. Tenn.) (C.J. Crenshaw) ("As a general matte, [promissory estoppel] is not viable when a valid contract exists.

---

[3] In his brief, Shunk argues that his reliance was reasonable because he brought his ethical concerns about working with Crone to other members of the Group and therefore complied with Trane's Code of Conduct which instructs Trane employees to bring ethical concerns to any of a number of individuals, including their managers. (Doc. No. 38-2 at 16). This completely misses the mark. Nothing in the record indicates that the Code of Conduct would absolve Shunk of responsibility for his actions simply because he discussed those actions with his managers (especially when those managers were all also intimately involved in the potentially unethical conduct).

11

However, Tennessee courts have upheld a claim for promissory estoppel despite the existence of a valid contract in limited cases where an alleged promise was made at the time of contracting and operated to expand, not to add to or vary the terms of a contract."). Here, there is no doubt that a valid contract covers Shunk's compensation and did so well before May 2020. (Doc. No. 38 at ¶ 4). At all relevant times, the Policy dictated the compensation that Shunk had earned prior to his termination. (Id.). As previously noted, Shunk neither challenges his at-will employment, nor the Policy. These concessions are again dispositive. Any argument that Shunk may recover more than what the terms of his employment would allow has no home in the law. See HCA Health Servs. of Tenn., Inc., 46 S.W.3d at 197; Whitehaven, 973 S.W.2d at 596; Belmont Univ., 334 F. Supp. 3d at 901–02.

## IV. CONCLUSION

At bottom, Trane was entitled to fire Shunk for any reason or no reason at all. It did so. Shunk is entitled be compensated pursuant to the Company's Policy—no more, no less. Because this dispute is governed as matter of law by Tennessee's at-will employment doctrine and the Compensation Policy, no genuine issue of material fact exists between the parties.

For the foregoing reasons, Trane's Motion for Summary Judgment (Doc. Nos. 31) will be granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

12

Case 3:21-cv-00562   Document 49   Filed 11/16/22   Page 12 of 12 PageID #: 1314